IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE COOK,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )     C.A. No. 17-1504 (MN)
                                       )
NANCY A. BERRYHILL, Acting             )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )

## MEMORANDUM OPINION

Valerie Cook – *Pro Se* Plaintiff

Nora Koch, Regional Chief Counsel, Eda Giusti, Assistant Regional Counsel, Heather Benderson, Special Assistant United States Attorney SOCIAL SECURITY ADMINISTRATION, Office of the General Counsel, Philadelphia, PA – attorneys for Defendant.

March 21, 2019
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

# I.    **INTRODUCTION**

Plaintiff Valerie Cook ("Ms. Cook" or "Plaintiff"), a *pro se* litigant,[1] appeals the decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her claim for Social Security Disability Insurance benefits under Title II of the Social Security Act.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Ms. Cook[2] and the Commissioner.  (D.I. 11, D.I. 12).  Ms. Cook, in essence, asks the Court to direct an award of benefits in her favor or, alternatively, to remand for additional administrative proceedings. (D.I. 11).  The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for benefits.  (D.I. 13 at 12).  For the reasons stated below, the Court will deny Plaintiff's motion and grant Defendant's motion.

# II.    **BACKGROUND**

## A.    **Procedural History**

In December 2013, Plaintiff filed an application for Disability Insurance Benefits under Title II and for Supplemental Security Income Benefits under Part A of Title XVIII[3] of the Social

---

[1]    During the administrative proceedings Ms. Cook was represented by counsel.  For the appeal, she proceeds *pro se*.

[2]    The Court construes the letter filed by Ms. Cook asking for Social Security to approve her for her "Social Security Access" (D.I.11) as a motion for summary judgment.

[3]    Plaintiff's Application Summary for Disability Insurance Benefits (Tr. 312-13) indicates that she applied for a period of disability and/or insurance benefits under both Title II and Part A of Title XVIII of the Social Security Act.  During the September 15, 2016 hearing in this case, however, the ALJ stated that he only had a Title II claim in front of him. (Tr. 82).

Security Act, alleging disability beginning May 14, 2011.[4]  (Tr. 312-13).[5]  Plaintiff's claim was initially denied on February 7, 2014 (Tr. 33, 144-55) and denied again upon reconsideration on July 7, 2014 (Tr. 33, 201-06).  Plaintiff then requested a hearing before the Administrative Law Judge ("ALJ") on August 25, 2014.  (Tr. 207-08).  The hearing took place on September 15, 2016[6] during which both Ms. Cook and Vanessa Emmus ("Ms. Emmus"), an impartial vocational expert ("VE") testified.  (Tr. 79-122).  After the hearing, on November 4, 2016, the ALJ issued a decision finding that Plaintiff "was not under a disability within the meaning of the Social Security Act from May 14, 2011, through the date last insured," December 31, 2012.  (Tr. 34).  Plaintiff requested review of the ALJ decision by the Appeals Council on December 27, 2016.  (Tr. 20).  On June 16, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 10-12).

On October 25, 2017, Plaintiff filed suit in the District of Delaware seeking judicial review of the Commissioner's denial of benefits.  (D.I. 2).  The parties' completed briefing on the cross motions for summary judgment on May 18, 2018.  (D.I. 11-13).

---

[4]    Plaintiff also filed applications for (1) Disability Insurance Benefits in December 2008 and (2) Supplemental Security Income Benefits under Title XVI in June 2009.  On May 13, 2011, ALJ Showalter issued a Decision denying Plaintiff's claims.  (Tr. 170-85).  The current application alleges disability beginning May 14, 2011, the day after ALJ Showalter's Decision.

[5]    References to "Tr." are to the "Transcript of Social Security Proceedings" filed on February 15, 2018.  (D.I. 8).

[6]    A brief hearing also took place on June 13, 2016 during which Plaintiff's attorney explained that she and Plaintiff had been out of touch and that Plaintiff's medical records had not been updated.  The hearing was postponed so that Plaintiff could gather additional medical records.  (Tr. 123-30).

###### B. Factual History

Plaintiff applied for Disability Insurance Benefits in December of 2013 when she was 45 years old. (Tr. 312). In the current application, Plaintiff lists May 14, 2011 as her alleged onset date. (Tr. 351). She completed her education through the 7th grade, attended no special education classes, and received no specialized job training. (Tr. 356). According to Plaintiff's December 19, 2013 Disability Report, she has held jobs as a deboner, eviscerationist, machine operator, and quality control specialist[7] in the 15 years prior to becoming unable to work. (Tr. 357).

###### 1. Disability Report – December 19, 2013(Form SSA-3368)

In her December 19, 2013 Disability Report (Form SSA-3368) (Tr. 254-64), Plaintiff asserted that she has the following physical or mental conditions that limit her ability to work (Tr. 355): Fibromyalgia;[8] Depression; Bi-Polar Disorder; Osteomyelitis/Septic Arthritis; Anxiety; Narcolepsy; Sleep Apnea; and Asthma. She indicated both that she stopped working because of her conditions, and that her conditions had not caused her to make changes to her work activity. (Tr. 356). She also listed the following medications: Ambien (sleep aid), Alprazolam XR (anxiety), Cymbalta (bi-polar disorder), Seroquel (depression), Topamax (appetite reduction), Trazodone (depression), and Vistaril (anxiety), all prescribed by nurse practitioner Ihuoma Chuks at Mind and Body Consortium,[9] Fentanyl (Fibromyalgia) and Percocet (Osteomyelitis/Septic

---

[7] At the September 15, 2016 hearing, Plaintiff testified that she also held jobs as a nursing assistant, as a prep cook, and in a clam factory where she prepared and cleaned clams. (Tr. 89-93)

[8] At the September 15, 2016 hearing, the ALJ stated that he could not consider fibromyalgia as a condition because there was nothing in the record regarding a diagnosis or treatment by any doctors for fibromyalgia. (Tr. 110).

[9] Plaintiff lists the medications as being prescribed by a Dr. Imonia Ihuomathuks of Mind and Body Consortium, but the record indicates that it was actually nurse practitioner Chuks.

Arthritis), prescribed by Dr. Senad Cemerlic of ABG Pain Management, and Tramadol (Osteomyelitis/Septic Arthritis) prescribed by Dr. Fanta Morgan of Delaware Podiatric Medicine. (Tr. 358). In addition to the aforementioned doctors, Plaintiff listed Dr. Richard DuShuttle of Capital Orthopaedic, Dr. Tutse Tonwe of Family Health of Delaware, and Kent General Hospital as providers/hospitals that may have medical records about her physical and mental conditions. (Tr. 359-63).

2. **Disability Reports – Appeal – April 7, 2014 & August 25, 2014 (Form SSA-3441)**

In her Disability Reports – Appeal dated April 7, 2014 and August 25, 2014 (Form SSA-3441) (Tr. 389-397, 402-07), Plaintiff indicated that she has no new physical or mental limitations and no new illnesses, injuries, or conditions. (Tr. 390-91, 402). She listed no new treating physicians who may have medical records about her physical and mental conditions and no new medications. (Tr. 391-93, 397, 403).

3. **Medical History, Treatment, and Conditions**

The Court has reviewed all medical records submitted. The relevant medical history begins in May 14, 2011 and continues through December 31, 2012, the date last insured. (D.I. 8-9 – 8-18, Exs. B1F – B22F).

a. **Foot Problems**

Plaintiff has undergone several surgical procedures for foot impairments, including bilateral plantar fasciitis, foot hallux rigidus, 4 capsulitis, and degenerative joint disease of the great toe (Tr. 611-17, 640-708). These procedures included having warts excised from her right foot in September of 2001, and the excision of a plantar's wart from her left foot in December of

2011. (Tr. 704-05).[10] Additionally, Plaintiff had a bunionectomy on her left foot in December of 2008 and fusion of the first metatarsophalangeal joint in December of 2011. (Tr. 425). After the fusion surgery, she developed an infection and osteomyelitis[11] and had most of the hardware in her foot removed. (Tr. 464). She later (in February of 2012) had the remaining hardware removed. (Tr. 40, 464). She also had an irrigation and debridement procedure and partial osteotomy of the left foot in March 2012. (Tr. 40, 436, 454, 464, 475). After the debridement, Plaintiff denied any complaints from the procedure. (Tr. 427).

Between July of 2011 and December of 2013, Plaintiff was seen for complaints of bilateral foot pain, swelling, and tenderness. (Tr. 611-17, 640-708). The records suggest that Plaintiff was not fully compliant with her doctors' recommendations. For example, in January of 2012, Plaintiff was weight-bearing against doctor's advice, in April of 2012, she declined to wear a boot as recommended, and she also failed to follow up with seeing a physician as recommended. (Tr. 664, 678, 680, 683, 686). Nevertheless, the records reflect that Plaintiff's conditions improved with treatment. For example, in March and April 2012, progress notes document improvement in the swelling of her left foot, and a July 2012 treatment note documents improvement of pain, decreased swelling and stiffness, and no numbness, weakness, or redness. (Tr. 431, 433, 689). An MRI of Plaintiff's left foot in May 2013 showed no gross abnormality. (Tr. 734).

---

[10]    It appears that Plaintiff also had a plantar's wart excised from her right foot in September of 2014, after her last insured date. (Tr. 955-56, 967-71).

[11]    Plaintiff was treated by Dr. Ramesh Vemulapalli for the infection between February 9, 2012 and April 11, 2012. (Tr. 425-434). Additional records for Plaintiff's surgery and treatment for her infection are included in the records of Kent General Hospital. (Tr. 435-610, 853-78).

### b.      Asthma

Plaintiff has had asthma for many years.  (Tr. 98).  She testified that she has used an inhaler for "as far as I can remember," and required a nebulizer during the time of her foot infection. (Tr. 98).  Once the infection was resolved, however, she no longer needed to use the nebulizer (Tr. 98-99, 103).

### c.      Mental Health Conditions

Plaintiff was treated for mental health complaints beginning in October 2012,[12] at which time she was diagnosed with bipolar disorder, anxiety, and chronic insomnia.  (Tr. 898).  Repeated mental examination follow up indicated some issues with memory, irritability, and concentration, but no significant abnormalities.  (*See e.g.*, Tr. 823, 825, 858, 886).  Treatment notes also reflect that Plaintiff did well on medication.  (Tr. 886-895).

### d.      Medical Source Opinions

#### 1.      Ihuoma Chuks, of Mind and Body Consortium

Ihuoma Chuks, is a nurse practitioner, at the Mind and Body Consortium who saw Plaintiff intermittently between January of 2009 and June of 2014.  (Tr. 719-727, 879-95, 916-35).  There do not appear to be any treatment notes from nurse practitioner Chuks dated between May 14, 2011 and December 31, 2012, but in September of 2013, nurse practitioner Chuks completed a psychiatric/psychologist impairment questionnaire check-off form that listed October 12, 2012 as the date of first treatment.  (Tr. 898).  In the form, nurse practitioner Chuks indicated that Plaintiff

---

[12]      Plaintiff had previously been admitted for treatment at Dover Behavioral Health in October of 2009.  (Tr. 906-07).  Treatment notes indicated that she had had a "history of hospitalizations for depressive symptoms and a history of noncompliance with medication and treatment.  At the time of admission, she has complained of irritability, mode swings, poor sleeping, and panic attacks." She was ultimately discharged for outpatient treatment, though the record does not contain any evidence of such treatment.

was incapable of tolerating even low stress at work due to her mental complaints.  (Tr. 887, 898-905).  When asked the earliest date that Plaintiff's limitations commenced, nurse practitioner Chuks responded "10/12/12?"  (Tr. 905).

### 2. Dr. Senad Cemerlic of ABG Pain Management

Plaintiff saw Dr. Cemerlic between July of 2013 and January of 2014 for pain in her feet.  (Tr. 618-639, 779-810).  Treatment notes indicate the Plaintiff complained of constant pain in her feet, and had pain when sitting, standing, bending, walking, and lifting.  (Tr. 618, 621-22, 624).  She noted that medication and exercise helped her pain.  (Tr. 618, 624).  Plaintiff was prescribed fentanyl and Percocet for pain.  (Tr. 623, 626-27).

### 3. Delaware Podiatric Medicine

Plaintiff was treated at Delaware Podiatric Medicine between July of 2011 and January of 2016.  (Tr. 611-617, 936-51, 957-63, 972-980).  Treatment notes for July of 2011 are unsigned by Harry S. Tam.  Those notes indicate that her vascular status and neurological status were normal, but that her orthopedic exam was positive and evidenced pain in her foot upon movement and palpation.  (Tr. 616-17).  He noted that he would "prefer to manage her conservatively, but she is insistent on surgical management."  (*Id.*).

Beginning in May of 2013, Plaintiff began seeing Dr. Morgan.  (Tr. 611-615, 936-51).  Treatment notes indicated pain on palpation, left 2nd hammer toe and right 2nd hammer toe but no other orthopedic problems.  (Tr. 611-615, 936-51, 957-63, 972-1001).  Dr. Morgan ordered an MRI of Plaintiff's left foot in May of 2013, which demonstrated no gross abnormality.  (Tr. 734).  On June 13, 2013 (after Plaintiff's insured status expired), Dr. Morgan stated that Plaintiff could work, but required sedentary work that did not involve weight bearing on her left foot.  (Tr. 910).

4. Dr. Richard DuShuttle of Capital Orthopaedic,

Dr. Richard DuShuttle, a surgeon, treated Plaintiff between July of 2011 and December of 2013 and again from September of 2014 through July of 2015. (Tr. 955-56, 967-71). Dr. DuShuttle completed check-off welfare forms on Plaintiff's behalf in June of 2013. He checked off that Plaintiff was unable to work for 6-12 months and noted in his comments that she could not work for 6 months. (Tr. 931).[13]

5. Dr. Tutse Tonwe of Family Health of Delaware

Plaintiff saw Dr. Tonwe as her primary care doctor between July of 2010 and January of 2014. Treatment notes indicate Plaintiff suffered from persistent foot pain, asthma, insomnia, and sleep apnea. (Tr. 728-78, 811-52). Chest x-rays ordered by Dr. Tonwe were normal (Tr. 770-71).

6. State Agency Physicians

Two state agency physicians reviewed Plaintiff's claim for benefits – one in January 2014 (Tr. 144-54) and another in July 2014 (Tr. 156-65). Both reviewed Dr. Tonwe's and Dr. DuShuttle's treatment notes. Both opined that Plaintiff had the physical residual functional capacity to perform the lifting demands of light work, restricted to: standing/walking four hours and sitting six hours in an eight-hour workday; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; and avoiding concentrated exposure to hazards such as machinery and heights. (Tr. 151-53, 162-63). In addition, two state agency psychologists reviewed Plaintiff's claim for benefits – again one in January 2014 and another in June 2014. (Tr. 149-150, 163-64). Both opined that Plaintiff

---

[13] In her cross motion, the Commissioner asserts that Dr. DuShuttle also filled out a form in March of 2013 indicating that Plaintiff would be unable to work for 3 months. (D.I. 13 at 4). It is unclear, however, who signed that form. (Tr. 932).

presented insufficient evidence to determine the nature and severity of any mental limitations during the relevant period. (Tr. 150, 164).

### 4. The Administrative Hearing

On September 15, 2016, the ALJ conducted an administrative hearing, at which both Plaintiff, Ms. Cook, and VE, Ms. Emmus, testified. (Tr. 80).

### a. Plaintiff's Testimony

Plaintiff testified that she had had surgeries on both her feet to remove warts and her left foot became infected for which she had to have a pic line inserted for antibiotic delivery. (Tr. 94-95). She characterized the pain in her feet as a nine out of 10, with 10 being the worst pain imaginable, and that she could not stand on her feet during this time. (Tr. 95-96). At times, she used a walker, crutches, and boot shoe(s), but acknowledged that she did not always wear the boot shoe(s) as instructed by her physician because they were "really tight and it felt like it was cutting off [her] circulation in [her] foot." (Tr. 96). When pressed by the ALJ as to why she ignored her doctor's instructions to wear the boot shoe, Plaintiff testified that she could hardly get the boot on and that her doctor did not suggest any changes to make it easier to wear the boot. (Tr. 97). After the infection cleared up, Plaintiff was able to walk without a cane or walker (Tr. 98), and at the time of the hearing she wore pads/cushions on the bottom of her feet (Tr. 97).

As to Plaintiff's asthma, she testified that she has had asthma since she was younger and that during the time of her foot infection, she was using a nebulizer two times a day; however, since that time, she has only had to use an albuterol inhaler. (Tr. 98-99). At the time of the hearing, Plaintiff testified that she currently only got short of breath if she walked for a distance, went up and down stairs, and with the change of weather. (Tr. 104).

Plaintiff testified that she had "really bad bipolar, anxiety . . . really bad chronic, chronic pain with [her] feet and [her] back, and remembering things." (Tr. 94). Plaintiff testified that she was treating with Mind and Body[14] and that she had approximately four different counselors there over a period of time. (Tr. 99). She admitted that she had tested positive for marijuana and cocaine use, but testified she only used cocaine one time, not regularly. (Tr. 99, 102). She testified that she was taking her prescription drugs as prescribed and not over or under using them. (Tr. 103).

When the ALJ questioned Plaintiff about her activities during the 2011/2012 timeframe, Plaintiff testified that: (1) she was not walking much; (2) she could not lift anything; (3) she had carpal tunnel for which she did not have surgery; (4) her ability to sit was very limited because her legs and feet would cramp; and (5) she would have really bad mood swings and cry all the time. (Tr. 104-07).

When questioned by her attorney, Plaintiff testified that her inability to work and to do the things she used to do caused her to have very bad mood swings, sometimes causing her to cry about four times throughout a day, and caused her to become very anxious. (Tr. 108-09).

---

[14] The ALJ notes that "there might have been a break in treatment at Mind & Body" because the records submitted are from 2009 and then not again until 2013. (Tr. 99). Plaintiff testified that there was no break and that she had several different counselors there. (Tr. 99). Later in the hearing, in an exchange between the ALJ and Plaintiff's attorney, Plaintiff's attorney agreed with the ALJ – that there are only records from Mind and Body from 2009 and then not again until 2013. (Tr. 111-12). At the end of the hearing, the ALJ left the record open for two weeks for Plaintiff to follow-up with Mind and Body to obtain additional records. (Tr. 120). As noted in the ALJ's Decision, however, "counsel provided no additional information" and he closed the record concluding that he "had sufficient information in exhibit B11F to determine the impact that treatment at Mind and Body would have on the claimant's condition, and there is nothing to suggest that additional records exist, and even if they did exist, that the review of additional records would have any impact on the conclusions regarding the severity of the claimant's mental health condition or her work-related limitations." (Tr. 33-34).

### b.    Vocational Expert's Testimony

Ms. Emmus was asked by the ALJ to consider a hypothetical involving an individual of

Plaintiff's age, education, and work experience and to assume that the individual:

> is limited to less than the full range of sedentary work and that they
> would need the ability to alternate to standing after every 45 minutes
> of sitting, standing for up to 15 minutes at the workstation; the[y]
> would need the ability to alternate to sitting after every 15 minutes
> of standing and could then remain seated for 45 minutes at the
> workstation; this individual would have no ability to use foot
> controls and could use hand controls on a frequent basis; this
> individual would be able to handle frequently, finger, and feel on a
> frequent basis instead of constant; this individual would be able to
> occasionally climb ramps and stairs, balance, stoop, kneel, crouch,
> and crawl, but could never climb ladders, ropes, or scaffolds; this
> person should never be exposed to unprotected heights, moving
> machinery, and should avoid concentrated exposure to humidity and
> wetness, dusts, odors, fumes and pulmonary irritants, extreme cold,
> extreme heat, and only occasional vibration; this individual would
> be limited further to simple, routine, repetitive tasks, but not at a
> production rate pace; they could occasionally interact with
> supervisors and coworkers, but never with the general public.

(Tr. 116-17).  Based on that hypothetical, the ALJ asked whether Plaintiff could perform her past

work to which Ms. Emmus answered "no."  However, Ms. Emmus responded in the affirmative

when asked if Plaintiff could perform other work that existed in the national economy and gave

the examples of:  (1) addresser; (2) table worker; and (3) general sorter all of which are classified

in the Dictionary of Occupational Titles ("DOT") as unskilled, sedentary exertion level with

sit/stand option.[15]  (Tr. 117-18).

When questioned by Plaintiff's counsel, Ms. Emmus testified that a person off task 20%

of the workday due to a lack of focus and concentration could not sustain competitive employment.

---

[15]    The "sit/stand option" presented in the ALJ's hypothetical is not addressed in the DOT.
(Tr. 118).  Ms. Emmus's testimony as to the "sit/stand option" is based on her experience
as a vocational expert.  (Tr. 118-119).

(Tr. 119).  Ms. Emmus further explains that being off task 15% or more of the time in an eight-hour workday would not allow the employee "to be on production as far as what is required of them."  This testimony is based on Ms. Emmus's experience as a vocational expert as this issue is not addressed in the DOT.  (Tr. 119-20).

### c.     The ALJ's Findings

On November 4, 2016, the ALJ issued the following findings (Tr. 33-46):

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 14, 2011, through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: obesity, bilateral plantar fasciitis, foot hallux rigidus, capsulitis, degenerative disc disease of the left great toe, asthma, sleep apnea, and bipolar disorder with depression and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she would need the ability to alternate to standing for up to 15 minutes after every 45 minutes of sitting. She has no ability to use foot controls, but can use hand controls on a frequent basis. She could handle, finger, and feel on a frequent basis. She would be able to occasionally climb ramps/stairs, balance, kneel, crouch, and crawl, but never climb ladders/ropes/scaffolds. She should never be exposed to unprotected heights or moving machinery, and avoid concentrated exposure to humidity, wetness, dusts/odors/fumes/pulmonary irritants, extreme cold and extreme heat. She should only be exposed to occasional vibration. Additionally she would be limited to simple routine work but not at a production pace. She can occasionally interact with supervisors and co-workers, but never with the general public.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.	The claimant was born on July 30, 1968 and was 44 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8.	The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.	Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.	The claimant was not under a disability, as defined in the Social Security Act, at any time from May 14, 2011, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(g)).

## III.  LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV.   DISCUSSION

### A.   Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the Social Security Income ("SSI") program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Zirnsak v. Colvin*, 777 F.3d 607, 611-612 (3d Cir. 2014). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Zirnsak*, 777 F.3d at 611. If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *Id.* If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Zirnsak*, 777 F.3d at 611. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant

is presumed disabled. *Id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1); *Zirnsak*, 777 F.3d at 611 (quoting 20 C.F.R. § 404.1545(a)(1)). "[T]he claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of nondisability when claimant can adjust to other work). At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing." *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In other words, the Commissioner ". . . is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). In making this determination, "the Commissioner uses the RFC

assessment, . . . and the testimony of vocational experts and specialist." *Zirnsak*, 777 F.3d 612. "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'" *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Comm'r*, Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

### B.     Issues Raised on Appeal

Plaintiff filed this appeal *pro se* and the Court liberally construes her submissions and "appl[ies] the applicable law, irrespective of whether [s]he has mentioned it by name." *Holley v. Department of Veterans Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same standard in the context of a social security appeal).

In her motion, Plaintiff requests that "Social Security should approve [her] for social security access" because she has been permanently disabled for ten years. (D.I. 11 at 1). With her motion, Plaintiff submits new evidence: (1) a Health Assessment Form from Dr. Tonwe; (2) a Request for Reconsideration; (3) medical records dated April 2018; and (4) a statement from her roommate. (D.I. 11). The Commissioner argues that "substantial evidence supports the ALJ's finding that Plaintiff did not meet her burden of proving she was disabled . . ." between March 14, 2011 and December 31, 2012, (D.I. 13 at 6-7). The Commissioner further argues that "Plaintiff's new evidence does not advance her claim." (*Id*. at 10).

### 1.     Substantial Evidence Supports The ALJ's Determination

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v.*

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

In making his determination, the ALJ conducted the required a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Zirnsak v. Colvin*, 777 F.3d 607, 611-612 (3d Cir. 2014). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability through her date last insured. (Tr. 36). At step two, the ALJ found that Plaintiff had severe impairments of obesity, bilateral plantar fasciitis, foot hallux rigidus, capsulitis, degenerative disc disease of the left great toe, asthma, sleep apnea, and bipolar disorder with depression and anxiety. (Tr. 36). At step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 37). The ALJ next determined that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work. (Tr. 39). The ALJ then found, based on vocational expert testimony, that despite her limitations, although Plaintiff could no longer perform any of her past relevant work because it ranged between light and medium in exertion, she could nevertheless perform alternative sedentary work, including the representative jobs of addresser, table worker, and general sorter. (Tr. 44-45).

After review of the record and the ALJ's decision, the Court concludes that the record contains substantial evidence to support the ALJ's finding that Plaintiff could perform a limited range of unskilled, sedentary work during the relevant period. The evidence showed that Plaintiff's foot complaints had improved after her procedures. (Tr. 431, 433, 689). An MRI of Plaintiff's left foot taken in May 2013 showed no gross abnormality. (Tr. 734). Moreover, as the ALJ observed, Plaintiff's failure to follow prescribed treatment indicated that her complaints were not as severe as she alleges. (Tr. 42).

As to physician opinions, Plaintiff offered the opinion of Dr. DuShuttle, her surgeon, who completed a check-off report for Plaintiff to receive welfare benefits. (Tr. 931-32). As an initial matter, a determination made by a non-governmental agency that an individual is disabled is not binding on the Commissioner. 20 C.F.R. § 404.1604; *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984) (applying Commissioner's regulation at 20 C.F.R. § 404.1504 in finding that determination by state workers' compensation agency is not binding in social security adjudication). Moreover, in the June 2013 report, Dr. DuShuttle indicated that Plaintiff would be unable to work for six months. (Tr. 931-32). The Act, however, defines disability as the inability to do any substantial gainful activity by reason of any medically determinable impairment, "which can be expected to

result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Thus, the ALJ was not required to give Dr. DuShuttle's comments on the form any significant weight.

The ALJ was also not required to give significant weight to Dr. DuShuttle's opinion because it is not consistent with the medical evidence and other opinions of record. 20 C.F.R. § 404.1527(c)(4) ("the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion"). For example, Plaintiff's podiatrist, Dr. Morgan, opined in June 2013 that Plaintiff could perform sedentary work despite her foot complaints. (Tr. 910). Similarly, two state agency physicians reviewing Plaintiff's claim for benefits in January 2014 and July 2014, respectively (including Dr. DuShuttle's treatment notes), opined that Plaintiff had the physical residual functional capacity to perform a limited range of sedentary work. (Tr. 151-53, 162-63). The ALJ accounted for Plaintiff's physical limitations in the hypothetical question to the vocational expert, and the vocational expert identified sedentary work Plaintiff could perform despite her restrictions. (Tr. 116-18). Accordingly, the ALJ's finding that Plaintiff had the physical residual functional capacity to perform a limited range of sedentary work prior to December 31, 2012 is supported by substantial evidence.

Similarly, the ALJ's mental residual functional capacity assessment is also supported by substantial evidence. The record indicates that despite earlier hospitalization, Plaintiff did not commence mental health treatment until approximately two months before her insured status expired, and repeated mental examination findings showed no significant abnormalities. (Tr. 823, 825, 858, 886, 898). Treatment notes also reflect that Plaintiff did well on medication. (Tr. 886-95).

The ALJ was not required to give significant weight to the findings of Plaintiff's nurse practitioner. (Tr. 887, 898-905). As the ALJ explained, nurse practitioner. Chuks' findings are simply not supported by the record because, as just discussed, Plaintiff's mental examination findings showed no significant abnormalities, and treatment notes show that she did well on medication. (Tr. 823, 825, 858, 886-95, 898). 20 C.F.R. § 404.1527(c)(4) 5 ("the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion"). Furthermore, two state agency psychologists reviewing Plaintiff's claim for benefits in January 2014 and June 2014, respectively, both opined that Plaintiff presented insufficient evidence to determine the nature and severity of any mental limitations during the relevant period (Tr. 150, 164).

In any event, the ALJ accounted for Plaintiff's mental conditions that were supported by the record by restricting her to simple, routine, repetitive tasks (but not at a production rate pace); with only occasional interaction with supervisors and co-workers, and no interaction with the general public. (Tr. 116-17). The vocational expert was able to identify work Plaintiff could perform despite those limitations. (Tr. 117-18). Accordingly, the ALJ's mental residual functional capacity assessment is supported by substantial evidence.

### 2. Plaintiff's New Evidence

Plaintiff's has submitted additional evidence to this Court in her motion papers. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. To be entitled to a "new evidence" remand, Plaintiff must demonstrate that the

additional evidence is "new" and "material" and also provide "good cause" for failing to provide

such evidence into the record in a prior proceeding. *Matthews*, 239 F.3d at 592-94; *Szubak v. Sec'y*

*of Health and Human Servs.*, 745 F.3d 831, 833 (3d Cir. 1984).

Here, Plaintiff has not met the requirements for a "new evidence" remand under the sixth

sentence of 42 U.S.C. § 405(g). Plaintiff submitted a health assessment form from her family

physician, Tutse Tonwe, M.D., dated June 29, 2017, almost five years after the expiration of her

insured status, and almost six months after the ALJ's decision. (D.I. 11 at 5-6 of 18). She also

submitted medical records dated April 2018 (again years after her insured status expired) (D.I. 11

at 11-13 of 18), and a statement from Plaintiff's roommate also dated April 2018 (D.I. 11 at 4 of

18).

Plaintiff has not asserted that this evidence was "new" or "material." In any event,

Plaintiff's newly submitted evidence does not meet the materiality requirement because the new

evidence not only post-dates the ALJ's decision (November 4, 2016), but it post-dates her insured

status by several years. (Tr. 34, 46). The ALJ's decision was dated October 11, 2016. (Tr. 58).

Under Third Circuit law, it is implicit in the materiality prong that new evidence must relate to the

time period for which benefits were denied and not evidence of a later-acquired disability or

subsequent deterioration of a previously non-disabling condition. *Szubak*, 745 F.2d at 833. As

the evidence Plaintiff now submits post-dates the ALJ's decision and the expiration of Plaintiff's

insured status, Plaintiff has failed to demonstrate that this evidence is relevant to the time period

at issue in this case – May 14, 2011 (Plaintiff's alleged onset date) through December 31, 2012

(Plaintiff's date last insured). (Tr. 45). If Plaintiff believes that the new evidence shows that she

is disabled after this time, her remedy is to file a new application, not to seek to overturn a decision

on her previous application that was correct at the time it was rendered. 20 C.F.R. § 404.620

(stating that if there is a hearing decision, an application will remain in effect until the hearing decision is issued).

**V.      CONCLUSION**

For the reasons stated, the Court deny Plaintiff's motion and grant Defendant's cross-motion for summary judgment.  An appropriate Order will issue.